UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ROBERT BELL, et al.,

               Plaintiffs,

    v.

KING COUNTY PUBLIC HOSPITAL
DISTRICT #1, et al.,

               Defendants.

CASE NO. C18-906 MJP

ORDER ON SUMMARY
JUDGMENT MOTIONS

The above-entitled Court, having received and reviewed:

1. Defendants PA C. Goon[1] and Dr. Alexander's Motion for Summary Judgment (Dkt.
   No. 12), Plaintiffs' Response in Opposition to Defendant Alexander's Motion for
   Summary Judgment (Dkt. No. 22), and Reply in Support of Defendant Dr.
   Alexander's Motion for Summary Judgment (Dkt. No. 28);

---

[1] Although named in the original complaint and in the opening brief of this motion, Defendant PA Goon was later
dismissed from this litigation by voluntary stipulation. Dkt. No. 21.

2. Defendants King County Public Hospital District #1, et al.'s Motion for Summary Judgment (Dkt. No. 19), and Plaintiffs' Response in Opposition to Defendant king County Public Hospital Defendants' Motion for Summary Judgment (Dkt. No. 30);

all attached declarations and exhibits; and relevant portions of the record, rules as follows:

IT IS ORDERED that Defendant Dr. Alexander's motion for summary judgment is GRANTED IN PART and DENIED IN PART; the motion is GRANTED as to Plaintiffs' claims for "medical negligence" and violations of the Americans with Disabilities Act ("ADA"), and DENIED as to the § 1983 and gross negligence claims.

IT IS FURTHER ORDERED that the motion for summary judgment by the remainder of the Defendants is GRANTED IN PART and DENIED IN PART as follows:

- Regarding Defendant King County Public Hospital District #1 (d/b/a Valley Medical Center), the motion is GRANTED as to the § 1983 claim, the ADA claim, and the "corporate negligence" claim;

- Regarding Defendants Bernie Dochnahl, Lisa Brandenburg, Barbara Drennen, Peter Evans, Jim Griggs, Gary Kohlwes, Mike Miller, Julia Patterson, Vicki Orrico, Donna Russell, and Tamara Sleeter (hereinafter "the Board Defendants"), the motion is GRANTED;

- Regarding Defendants Elizabeth Schaumberg and Mark Thomasseau, the motion is GRANTED as to the claims of violation of the ADA and "medical negligence;"

- Regarding Defendant Mark Thomasseau the motion is DENIED as to the § 1983 and gross negligence claims;

- Regarding Defendant Elizabeth Schaumberg, the motion is GRANTED as to the § 1983 and gross negligence claims;

## Background

A survivor of childhood sexual abuse, the decedent (Matthew Bell) was a man with a history of mental issues (Bipolar Disorder, depression, PTSD) dating from a young age.  In November 2016, he moved to Portland in a failed attempt to reconcile with his (second) ex-wife.  In the wake of this unhappy development, Matthew's brother (Anders) agreed to buy him a ticket to Tampa, Florida with a layover in Seattle.  Anders did so reluctantly – an ex-girlfriend of Matthew's lived in Florida and Anders was concerned about Matthew's proximity to the ex-girlfriend in his fragile mental and emotional state.

On December 2, 2016, Matthew arrived in Seattle at 10:32 p.m. for his layover.  While at SeaTac airport awaiting his next flight, he called Anders and revealed to him his detailed plan to commit suicide once he arrived in Florida.  Anders knew that their mother and stepfather were arriving in Seattle by plane at 12:15 p.m. the following day.  He kept Matthew on the phone while Anders' wife called the Port of Seattle Police to report the suicide plan. Just before 2:00 a.m. on December 3, the Port of Seattle Police contacted Matthew and took him into involuntary custody, transporting him to Defendant Valley Medical Center ("VMC") for evaluation.

Matthew was admitted to VMC at 3:12 a.m. The admitting nurse (not a Defendant) administered a Columbia-Suicide Severity Rating Scale ("C-SSRS") exam and determined Matthew was at a high risk of suicide. Following the assessment, the nurse initiated an Emergency Response Intervention Team ("ERIT") consult.  Dkt. No. 23, Decl. of Dreveskracht, Ex. 2.  The ERIT counselor (Defendant Schaumberg) interviewed Matthew at 5:21 a.m., detailing his mental health history, history of suicide attempts and the details of his latest suicide plan.  Id. at 7-8.  Matthew remained on suicide watch with an "anticipated" referral to a County Designated Mental Health Professional ("CDMHP").  Id., Ex. 4 at 6.

Another ERIT counselor, Defendant Thomasseau, met with Matthew at 9:00 a.m.  His notes from that interview indicate that Matthew had changed his mind about killing himself:

> **Symptoms / Behavior**:  Patient is alert, oriented, calm, cooperative, logical and coherent during interview.  He states that he had been thinking about those things, "but, I had changed my mind.  Besides, the flight has already left!  Matthew reports that things have been difficult "since things have fallen apart with Feather (ex- GF), but I know that I couldn't do anything like that, it would hurt my family too much."  He denies any current change in his vegetative symptoms.
>
> He states now that he plans on flying up to Alaska to "stay with my brother."

Dkt. No. 15, Decl. of Duany, Ex. 1 at 17.

Although not reflected in the notes prepared by Thomasseau, the Patient Care Timeline (Dkt. No. 23-2) indicates that Thomasseau spoke with Matthew's brother Anders at 9:04 a.m. Anders' declaration contains a lengthy recitation of that conversation, in which he reports laying out his brother's mental health history, suicide attempts, and the elements of his latest suicidal ideation in detail, along with his belief that Matthew would kill himself if he were released. Despite Anders' pleas that his brother be detained, at least for a few hours so that their mother could get from her plane to the hospital (and despite Thomasseau agreeing with Anders that Matthew was manipulative), Anders reports that Thomasseau told him that, based on Matthew's current indication that he was no longer suicidal, the decision had been made to release him and there would be no delay in implementing that decision.  Anders also says that his repeated requests to speak to someone else responsible for his brother's care were unsuccessful: "Nobody else would talk to me."  Dkt. No. 24, Decl. of Anders Bell at ¶¶ 16-23.  None of this evidence is controverted by Defendants.

At 10:25 a.m., Defendant Dr. Alexander made the decision to discharge Matthew.  Dkt. No. 23-2 at 11.  She indicates that, prior to discharging Matthew, she "reviewed Mr. Bell's

available records concerning his history" and spoke with Thomasseau, who reported that

Matthew "denied suicidal ideation, and that he had a safe plan for discharge." She then spoke

with Matthew, who again expressed no intent to harm himself or others, "made future-oriented

statements," and indicated he wanted to go to the airport to meet his mother. Dkt. No. 14, Decl.

of Alexander at ¶¶ 6-7. Based on her training and experience, her conversation with

Thomasseau and her interactions with Matthew, she found "no barriers to discharge." She

denied ignoring the patient's psychiatric issues, feeling that they had been properly assessed and

evaluated by the ERIT team. Id. at ¶ 9.

At 11:13 a.m. on December 3, the Patient Timeline lists Matthew's status as "Safety plan;

Discharged home." Dkt. No. 23-2 at 11. It appears from the timeline that he was discharged at

11:22 a.m, and that his "Discharge[] home" consisted of being walked out to the lobby and

handed off to security to call a taxi. At around 1:45 p.m., a police report reflects that "Port of

Seattle Communications received a phone call from a passenger who believed he observed a

'body' fall from the top of the SeaTac Airport parking Garage." Investigating Port Police

Officers found Matthew's body in the northeast corner of the first floor of the parking garage.

Dkt. No. 23-1 at 2.

Both sides present conflicting determinations by professional review boards of the events

leading up to the suicide. The State of Washington Medical Quality Assurance Commission

("MQAC") found in October 2017 that "the evidence would not support a finding of

unprofessional conduct and closed the case." Dkt. No. 14-1, Ex. 3 at 7. Earlier that year (July

2017), a report by the Washington State Department of Health ("DOH") found that VMC "did

not complete an in-depth suicide assessment, plan of care or appropriate discharge disposition"

in "violation of state law for acute care hospitals." Dkt. No. 23-10 at 4. The Secretary of Health

brought formal proceedings against Defendant Thomasseau, *recommending a finding of*
"*unprofessional conduct*" in violation of RCW 18.130.180 on his part. Dkt. No. 23-12 at 3.

Plaintiffs are Matthew's stepfather Robert (suing in his personal capacity and as administrator of Matthew's estate) and mother Leslie (suing in her personal capacity). Defendants are VMC, thirteen  individuals who occupy positions on VMC's Board of Trustees (hereinafter "the Board Defendants"), Elizabeth Schaumberg (the VMC ERIT mental health professional who initially evaluated Matthew), Mark Thomasseau (the VMC ERIT mental health professional who also evaluated Matthew and recommended his release), and Dr. Whitney Alexander (the VMC doctor who evaluated Matthew, reviewed the reports concerning him, and approved his release).

## **Standard of review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."); Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  Anderson

1  v.. Liberty Lobby, Inc., 477 U.S. 242, 253 (1986); T.W. Elec. Service Inc. v. Pacific Electrical

2  Contractors Association, 809 F.2d 626, 630 (9th Cir. 1987).

3  **<u>Discussion</u>**

4  Plaintiffs bring claims for violation of § 1983, 42 U.S.C. § 12132 (the "ADA"), medical

5  negligence, gross negligence, and corporate negligence.  Defendants seek dismissal of all claims.

6  The Court will analyze the claims in order.

7

8  <u>First Cause of Action: 42 U.S.C. § 1983</u>

9  Plaintiffs allege that all Defendants deprived Plaintiffs of their constitutional rights under

10  § 1983. There is no statutory immunity for these claims: "Conduct by persons acting under color

11  of state law which is wrongful under 42 U.S.C. § 1983… cannot be immunized by state law."

12  <u>Martinez v. State of California</u>, 444 U.S. 277, 284 n.8 (1980).

13  While Dr. Alexander does not argue that she was not acting "under color of state law,"

14  the other Defendants do ("providing medical services is not a state function under Section 1983;"

15  Dkt. No. 19 at 10).  They cite no authority for that principle and there is Ninth Circuit case law

16  holding that "the operation of a public hospital is state action and [] a public hospital is required

17  to meet the provisions of the Fourteenth Amendment." <u>Chudacoff v. Univ. Med. Ctr. Of S.</u>

18  <u>Nevada</u>, 649 F.3d 1143, 1150 (9th Cir. 2011).  Further, the Supreme Court has declared that,

19  where a public entity delegates its "affirmative obligation to provide adequate medical care" to a

20  physician, the physician is a "state actor" for § 1983 purposes.  <u>West v. Atkins</u>, 487 U.S. 42, 56

21  (1988).  Logically, this obligation extends to anyone on the staff of a public hospital and confers

22  "state actor" status on Schaumberg and Thomasseau as well as Alexander.

23

24

The remaining analysis is split between the "institutional" Defendants (i.e., VMC and the Board Defendants) and the "personal" Defendants (Alexander, Schaumberg, and Thomasseau). Regarding the former, an entity cannot be subjected to § 1983 liability merely because it employed a tortfeasor. Monell v. Dept. of Soc. Servs., 436 U.S. 658, 694 (1978). Liability may be assessed against a governmental entity only upon a showing "that the defendant's employees or agents acted pursuant to an official custom, pattern, or policy that violated the plaintiff's civil rights, or that the entity ratified the unlawful conduct." Johnson v. Mason County No. 14-5832, 2017 WL 750061 at *3 (W.D. Wash. Feb. 27, 2017)(citing Monell, 436 U.S. at 690-91).

While Plaintiffs claim that they "have adduced evidence that VMC instituted customs, patterns, established practices, and policies that violated Mr. Bell's civil rights" (Dkt. No. 30 at 14), the evidence (if it exists) was not presented in Plaintiffs' briefing. Their citations to "evidence" referred the Court to the police report, the ambulance report, and the "Emergency Department" ("ED") log of interactions with Matthew at VMC, none of which contain any evidence of "customs, patterns, established practices, and policies" that would support a claim that VMC or the Board Defendants are institutionally liable for the violation of anyone's constitutional rights.

Plaintiffs also add that they "*expect to adduce* evidence that VMC ratified and indemnified the unlawful conduct of Defendants Schaumberg, Thomasseau, and Alexander." Id. (emphasis supplied). In the first place, Plaintiffs' expectations cannot satisfy their burden at the summary judgment stage – they are required to produce proof of their claims, not allege what they "expect" to prove. In addition, their citation in support of this position appears to be to the declaration of Plaintiffs' counsel which merely identifies the "Patient Timeline" exhibit attached

to his declaration as Exhibit 2. The Court finds this inadequate to Plaintiffs' burden of proof at this stage.

Defendants cite to the immunity afforded "member[s] of the governing body of a public agency" by state statute. RCW 4.24.470. As discussed *supra*, the Board Defendants cannot use their statutory immunity under the RCWs as a defense against allegations of violating federal constitutional rights, but these Defendants also interpose their right to the "qualified immunity" that protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

The test for qualified immunity considers (1) whether a constitutional right was violated, (2) whether the law concerning that violation was clearly established, and (3) whether a reasonable official would have recognized that his/her actions violated that clearly established law. Saucier v. Katz, 533 U.S. 194, 201 (overruled on other grounds, Pearson v. Callahan, 555 U.S. 223 (2009).

Plaintiffs' attempts to articulate the constitutional right at issue for purposes of defeating qualified immunity fall far short of the mark. They mention the "professional judgment standard" (which applies to the individual Defendants; *see infra*) without citing a single case which holds an employer (much less the members of the board of a public entity) responsible under that standard. It is illogical and counterintuitive to hold VMC or the Board Defendants to standards of "judgment" for acts they did not commit. Such liability, if it exists at all, must be assessed upon a showing "that the defendant's employees or agents acted pursuant to an official

1  custom, pattern, or policy that violated the plaintiff's civil rights, or that the entity ratified the

2  unlawful conduct."  Johnson, *supra*.

3       Plaintiffs come a little closer to the mark in their citation to case law finding individuals

4  with "'final policymaking authority' personally liable when the policies, established practices, or

5  customs that they maintain result in a risk of serious harm or death to persons within their care

6  and custody."  Dkt. No. 30 at 7 (*citing* French v. Lincoln Hosp. Dist. No. 3, No. 10-0259, 2012

7  WL 2567064, at *4 (E.D. Wash. July 2, 2012).  Plaintiffs also cite Monell and Thomas v. County

8  of Riverside, 763, F.3d 1167, 1170 (9th Cir. 2014) in support of their position, but the problem

9  with all these cases is that they discuss liability for policies and practices in the context of

10 employee rights (termination, retaliation, etc.), not in the context of employee conduct which

11 may have resulted in the death of someone in the institution's care.  These are vastly dissimilar

12 situations which ideally would suggest to Plaintiffs the need to draw some legal or logical

13 analogy between the cases cited and the circumstances of their lawsuit or – at a very minimum –

14 cite to some specific policies or practices which they claim "result[ed] in a risk of serious harm

15 or death to persons within their care and custody."  They do neither.

16      Plaintiffs claim that "Defendants do not deny that they maintained 'a policy which

17 resulted in the death of Matthew Bell'" (Dkt. No. 30 at 8), but they are merely citing to a passage

18 in Defendants' motion where Defendants observe that "[Plaintiffs] plead generally that Hospital

19 Board Members… were 'grossly negligent' in maintaining a policy which resulted in the death

20 of Matthew Bell."  A comment regarding Plaintiffs' legal theory is not an "admission."

21      Plaintiffs further allege that "a reasonable jury can surely infer that since all of the actions

22 taken in regard to Matt 'comported with [VMS]'s policies and established practices'... VMC's

23 policies and established practices were a moving force and proximate cause of Matt's death."  Id.

24

The Court was unable to find the evidence Plaintiffs cited for that claim[2] -- it might be in some of the form language in documents that one or more of the individual Defendants signed (which, if so, is illegible in the materials Plaintiffs submitted), but Plaintiffs should be pointing to specific policy language or testimony regarding grossly negligent customary practices of VMC's hospital staff, and they do none of that.

Turning to the individual Defendants: while the complaint itself does not specify exactly what constitutional rights were violated by Defendants' conduct, Plaintiffs frame the issue as "based on Matthew's Fourteenth Amendment substantive due process right to adequate medical care while involuntarily committed to the custody of a state actor." Dkt. No. 12 at 17 (*citing* Mitchell v. Washington, 818 F.3d 436, 443 (9th Cir. 2016). The current standard for evaluating § 1983 claims in this context was articulated in Youngberg v. Romeo, 457 U.S. 307 (1982). Under that standard, the decisions of a medical professional regarding the treatment of an involuntarily committed patient are "presumptively valid," and

> liability may be imposed only when [a defendant's] decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

Id. at 323. "Liability under the due process clause cannot be imposed for mere negligence, a principle reflected in the professional judgment standard's requirement of a '*substantial departure* from accepted professional judgment.'" Patten v. Nichols, 274 F.3d 829, 842-43 (4th

---

[2] *See* Dkt. No. 30 at 8, n. 30: Plaintiffs cite first to "Dreveskracht Decl., Ex. 1, at 37-38" – Exhibit 1 is only a 3 page exhibit, so the citation to "37-38" is confusing. The next citation is to Ex. 3 of the same declaration, but the citation lacks any pin cite, leaving the Court to speculate where in the 3-page document (an ambulance form filled out when Matthew was brought to VMC) Plaintiffs' "proof" exists. Plaintiffs appear to be quoting some language from the form but the Court could not locate it (it may have been in the illegible "small print" where the ambulance crew and receiving VMC staff member signed off acknowledging the delivery). Lastly, Plaintiffs cite to Ex. 4 of the same declaration, the 15-page "Emergency Department Notes" – again without a pin cite – apparently alleging the same language is in that document. The Court was unable to locate it.

Cir. 2001)(*quoting* <u>Youngberg</u>, emphasis in <u>Patten</u>; the case also found that "denial-of-medical-care claims asserted by involuntarily committed psychiatric patients must be measured under <u>Youngberg</u>'s professional judgment standard;" <u>id.</u> at 842).

Plaintiffs agree that the "professional judgment" standard is the measure of the individual Defendants' liability, citing Ninth Circuit precedent holding the test "equivalent to that required in ordinary tort cases for a finding of conscious indifference amounting to gross negligence." <u>Estate of Conners v. O'Connor</u>, 846 F.2d 1205, 1208 (9th Cir. 1988). A 7th Circuit case applying the "deliberate indifference standard" found (in denying summary judgment) that, "where evidence exists that the defendants knew better than to make the medical decisions they did, a jury should decide whether or not the defendants were actually ignorant to risk of the harm that they caused." <u>Petties v. Carter</u>, 836 F.3d 722, 731 (7th Cir. 2016).

Defendants Schaumberg and Thomasseau offer very little by way of defense to this cause of action, confining their argument to a claim that Plaintiffs' complaint "fail[s] to offer any level of specificity as to who was involved in the alleged violations related to the denial of medical services." Dkt. No. 19 at 11. That would be a valid argument for a 12(b)(6) motion, but not a summary judgment, which goes to sufficiency of proof.

Regarding Defendant Thomasseau, Plaintiffs offer a lengthy list of conduct related to their claim that his actions amounted to a violation of Matthew's constitutional rights:

1. Failure to order a CDMHP evaluation, despite a C-SSRS rating Matthew as a high risk for suicide

2. Failure to act on information in the medical record and from his conversation with Matthew's brother that Matthew was an imminent suicide risk

3. Recommending a discharge without a further C-SSRS or CDMHP evaluation

4. Entry of "false information" into a second C-SSRS[3] (ordered after the decision to discharge was made) "in order to obtain an inaccurate suicidality rating" to justify the discharge decision (Dkt. No. 30 at 12)

5. Failure to convey "known suicidality information from the records and Matt's brother to subsequent healthcare providers" (Id.)

6. Discharging Matt to "home" without an adequate discharge plan.

The evidence regarding Thomasseau, viewed in the light most favorable to the non-moving party, could be found by a jury to constitute a "substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." When the determination of the Washington State Department of Health that the facts "if proven, would constitute unprofessional conduct in violation of RCW 18.130.180(4)" (Dkt. No. 23-12 at 3), is taken into consideration, this Defendant has clearly not succeeded in establishing his entitlement to summary judgment on the § 1983 claim.

The Court finds, however, that Plaintiffs have failed to come forward with evidence sufficient to sustain this claim against Defendant Schaumberg. Challenged by Defendants to

---

[3] Plaintiffs' evidence of "falsified information" consists of:

(a) Thomasseau's entry in the ED record indicating "History of treatment: **No.** Facility/Dates: **NA**" (Dkt. No. 23-4 at 9) when earlier in the report it was noted that Matthew had been hospitalized in Alaska in 2016 (Id. at 8), "a long hx of counseling & medication…has been in therapy his whole life… [m]ultiple hospitalizations in the past, including several days last spring in Alaska." (Id. at 4.). This evidence is confusing because there is a handwritten note next to the entry which says "see telephone interview w/ brother" – it is unclear who the author of the note is; if it was Thomasseau then the "no history of treatment" entry may simply be Thomasseau reporting what Matthew told him (then noting that the interview with the brother contradicts that representation).

(b) Thomasseau's entry in the ED record indicating "Substance use: **Denies** // History: **NA**" (Dkt. No. 23-4 at 9) which Plaintiffs claim is contradicted by the drug screen indicating that Matthew had "benzodiazepine" in his system.

produce proof of their allegation that Schaumberg's actions were either "grossly negligent" or represented a "substantial departure from accepted professional judgment" and thus violated the decedent's constitutional rights, Plaintiffs allege

> [f]rom the discovery that Plaintiffs have been able to gather thus far, however, it appears that: (1) none of the suicidailty [*sic*] information was passed on to subsequent healthcare providers; and (2) Defendant Schaumberg refused to order a MHP evaluation.

Dkt. No. 30 at 13.

In fact, Plaintiffs produce proof of neither of those assertions. Schaumberg recorded her information regarding the decedent in a "Patient Care Timeline" and a log entitled "ED Notes" (Dkt. Nos. 26-2 and 26-4). Both documents also contain later entries by other medical and mental health professionals (including Defendants Thomasseau and Alexander), belying any conclusion that Schaumberg failed to "pass on" the information she gathered about Matthew. Nowhere in any of the evidence produced is there an indication that Schaumberg refused to order a MHP evaluation; Plaintiffs have cited to none. In the absence of any evidence that Schaumberg's conduct fell below that required by the "professional judgment" standard, summary judgment on her behalf will be granted and she will be dismissed from the § 1983 claim.

The final individual Defendant is Dr. Alexander. There are facts going either way on the question of whether her conduct violated the "professional judgment" standard at issue in this cause of action.

The evidence of Matthew's long history of mental illness, suicide attempts, and recent suicidal ideation; the evidence offered by his brother of Matthew's background and patterns, including his manipulative nature (combined with his near-certainty that Matthew would kill himself if released); and the testimony of Plaintiffs' medical expert (which chronicles all the

ways in which Dr. Alexander's choices and omissions fell below accepted professional

standards; *see* Dkt. No. 27, Declaration of Dr. Pilcher) favor a finding that summary judgment is

not appropriate.

On the other hand, the evidence concerning Matthew's denial of any current suicidal

ideation, his missing the flight to Florida, expressing plans for the future and an intention to meet

his mother at the airport, combined with the conclusion of Defendant Thomasseau (whose

judgment Dr. Alexander, according to her declaration, trusted[4]) that release was indicated and

(later) her exoneration by the Medical Quality Assurance Commission, mitigate in favor of a

finding that her decision was within the parameters of accepted professional judgment.

Regarding Dr. Pilcher's opinion that Dr. Alexander's behavior represents "a substantial

departure from accepted professional judgment, practice, and standards," Defendants cite a 4th

Circuit ruling (Charters United States v. Charters, 863 F.2d 302, 313 (4th Cir. 1988)) opining

that the professional judgment standard

> makes inappropriate any attempt by the courts to determine the "correct"
> or "most appropriate" medical decision from among the variety of
> opinions that might be advanced on that point by medical experts. It
> makes relevant only one question for any experts called to opine in such a
> proceeding: was this decision reached by a process so completely out of
> professional bounds as to make it explicable only as an arbitrary,
> nonprofessional one. This standard appropriately defers to the necessarily
> subjective aspects of the decisional process of institutional medical
> professionals, Romeo, 457 U.S. at 322-23, 102 S.Ct. at 2461-62, and
> accords those decisions the presumption of validity due them. Id. at 323,
> 102 S.Ct. at 2462.

It is instructive that the Charters court does not completely reject the utility of

professional opinion in this area, but merely raises the bar. The opinion of Plaintiffs' medical

---

[4] Dkt. No. 14, Decl. of Alexander at ¶ 6.

expert is within the bounds of the "professional judgment" analysis in the sense that it confines itself to a determination, not of whether Dr. Alexander's actions were correct or incorrect, but whether they represented "a substantial departure from accepted professional judgment, practice, and standards." Dkt. No. 27 at 9.

Summary judgment on this claim is not appropriate as regards the Defendants Alexander and Thomasseau. The facts point in different directions and do not dictate a finding one way or another as a matter of law. This is precisely the kind of determination that is best left to a jury. The Court will GRANT summary judgment on the § 1983 claims as regards Defendant Schaumberg, VMC and the Board Defendants, and DENY it as regards Defendants Alexander and Thomasseau.


Second Cause of Action: 42 U.S.C. § 12132, et seq. (ADA)

Plaintiffs concede that "Title II of the Americans with Disabilities Act does not provide for personal capacity suits… Plaintiffs agree that their Title II claim against Defendant Alexander should be dismissed." Dkt. No. 22 at 15. In their response to the later-filed summary judgment motion brought by the remainder of the Defendants, however, Plaintiffs make no reference to the fact that they cannot sue individuals for ADA violations. Regardless, the same statutory prohibition applies to the other individual Defendants, and the ADA claim against Thomasseau and Schaumberg must be dismissed as well.

Even though VMC and the Board Defendants (as representatives of the institution) are proper subjects for an ADA suit, Plaintiffs fail to establish their right to proceed under that statute on these facts. To defeat summary judgment against an ADA claim, Plaintiffs must establish that:

1.  Matthew was an individual with a disability;

2.  Matthew was otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities;

3.  Matthew was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and

4.  Such exclusion, denial of benefits, or discrimination was by reason of his disability.

McGary v. City of Portland, 386 F.3d 1259, 1265 (9th Cir. 2004).

Defendants are willing to assume for the purposes of the motion that Matthew was disabled and qualified to receive the benefit of VMC's services. Dkt. No. 19 at 12. They deny that Matthew was not offered a reasonable accommodation (pointing, for instance, to the fact that he was offered voluntary admission, which he declined) or that anything that was done or not done for Matthew was because he was disabled; i.e., represented an act of discrimination against him.

Plaintiffs want the Court to equate Defendants' alleged negligence/gross negligence with (1) failure to provide a reasonable accommodation and/or (2) discrimination by reason of disability. There is simply no legal support for the position that negligence/gross negligence is an act of discrimination; nor, for that matter, do Plaintiffs present any evidence of actual discrimination.

Plaintiffs cite a case which they claim states that, under the ADA, "'failure to provide reasonable accommodation' in and of itself constitutes discrimination." Dkt. No. 30 at 15, *citing* Sexton v. County of Clark, Nevada, No 16-2289, 2018 WL 4494091, at 8 (D.Nev. Sept. 19, 2018)(*quoting* Updike v. Multnomah County, 870 F.3d 939, 951 (9th Cir. 2017)). That is not

what the case says: the <u>Updike</u> court simply held that "[t]he failure to provide reasonable accommodation <u>can</u> constitute discrimination."  870 F.3d at 951 (emphasis supplied).

Defendants are correct: they offered to "reasonably accommodate" Matthew (voluntarily commit him) and he declined.  Plaintiffs present neither statutory language nor ADA case law that an entity is required to "accommodate" someone who is refusing to be accommodated.  Admittedly, Matthew's mental condition makes the question of his ability to meaningfully refuse to be accommodated a debatable one, but (barring any legal authority to the contrary) that simply corroborates the notion that the ADA was not intended to apply in this situation.  Additionally, Plaintiffs present no legal support for the position that an involuntary mental health commitment is a form of "reasonable accommodation."   Summary judgment will be GRANTED as to all Defendants on Plaintiffs' ADA cause of action.


<u>Third Cause of Action: Medical Negligence (as to individual Defendants)</u>

RCW  71.05.120(1) states that

> No officer of a public or private agency… professional person in charge, his or her professional designee, or attending staff of any such agency… shall be civilly or criminally liable for performing duties pursuant to this chapter with regard to the decision of whether to admit, discharge, release… or detain a person for evaluation and treatment: PROVIDED, That such duties were performed in good faith and without gross negligence.

The statute clearly grants qualified immunity to physicians and hospital staff for duties "performed in good faith and without gross negligence."  Plaintiffs do not dispute this, but attempt instead to parse out the occurrences along the timeline from Matthew's admission to VMC to his discharge into (1) the decision to discharge itself and (2) "acts that preceded or followed the decision to discharge."  They claim support for this position in a Washington Court

of Appeals decision, <u>Poletti v. Overlake Hosp. Med. Ctr.</u>, 175 Wn.App 828 (2013), which, in overturning a Superior Court grant of summary judgment in the plaintiff's favor, "[left] for the trial court to consider on remand whether any hospital employees' acts that preceded or followed the decision to discharge may have caused" the decedent's death <u>Id.</u> at 837.

The two examples which the <u>Poletti</u> court gave of "mistakes the hospital allegedly made in caring for" the decedent are instructive – (1) failing to monitor the decedent (leaving the hospital unaware that the decedent was still not getting enough sleep) and (2) one of the nurses failing to follow a physician's orders (the opinion does not specify what the orders were regarding). <u>Id.</u> The "acts preced[ing] or follow[ing] the decision to discharge" which Plaintiffs are attempting to litigate separately from those acts subject to a gross negligence standard are:

- Schaumberg's "failure to pass along vital information about Matt's disposition to the next shift's ERIT Counselor;"

- Thomasseau's failure to order a CDMHP evaluation for Matthew;

- Thomasseau's "failure to act on information in the medical record and conveyed by Matt's brother;"

- Thomasseau's "recommendation that Matt be discharged without a clean C-SSRS or MHP evaluation;"

- Thomasseau's "knowingly entering false information into a second C-SSRS in order to obtain an inaccurate suicidality rating;"

- Thomasseau's failure to convey known suicidality information obtained from the records and Matt's brother;"

- Thomasseau's "failure to issue an adequate discharge plan;"

- Dr. Alexander's failure to communicate "with the previous physician or any other Emergency Department team member from the previous shift;"

- Dr. Alexander's "failure to make a determination as to Mr. Bell's decisional capacity;"

- Dr. Alexander's "failure to conduct a meaningful review of Matt's medical chart;"

- Dr. Alexander's "tragically inadequate discharge plan;"

- Dr. Alexander's "failure to ensure the completion" of an evaluation by a CDMHP.

Dkt. Nos. 22 at 16 and 30 at 9-10.  None of these acts can be separated from the decision to discharge -- all of these events are most fairly characterized as "duties pursuant… to the decision of whether to admit, discharge, release… or detain a person for evaluation and treatment" and thus can only subject the individual Defendants to liability if they were grossly negligent.

The negligent act cited by the Poletti court – failing to monitor whether the admittee was getting sufficient sleep – is a good example of a duty not related to the decision of whether to detain the patient (who had come in complaining of "sleeplessness, paranoia, hallucinations, and suicidal thoughts;" 828 Wn.App. at 831).  Every event cited by Plaintiffs here is directly in the chain of causation of the decision – i.e., "duties pursuant… to the decision" -- to release Matthew.  As such, Plaintiffs may not pursue claims of simple negligence against these Defendants.  The motion for summary judgment on the medical negligence cause of action is GRANTED, and the claim is DISMISSED.


Fourth Cause of Action: Gross Negligence

Defendants cite all the exculpatory evidence surrounding Dr. Alexander's decision to discharge Matthew – his recanting of a suicidal desire, refusal to voluntarily admit himself, missing the flight to Florida, "future-oriented" statements – and claim that there is no other

conclusion but that she performed her duties in good faith and without gross negligence.  The

findings of the Medical Quality Assurance Commission exonerating Alexander from any charge

of "unprofessional conduct" (which, according to RCW 18.130.180(4), includes "incompetence,

negligence, or malpractice") are cited as further evidence that her conduct could not have risen to

the level of gross negligence.

However, those are not <u>all</u> the facts.  In addition to the factors pointing to the lack of

exercise of professional judgment – the discounting of Matthew's prior history of suicide

attempts (including a detailed suicide plan which Matthew had been intent on carrying out only

hours before), the dire assessment given by his brother (including his belief that Matthew would

kill himself if released), the failure to call for a CDMHP evaluation and the refusal to hold him

for the 2-3 additional hours it would have taken for his mother to arrive – there is (1) the report

by the Washington State Department of Health finding that VMC "did not complete an in-depth

suicide assessment, plan of care or appropriate discharge disposition" in "violation of state law

for acute care hospitals"   (Dkt. No. 23-10 at 4) and (2) the opinion of Plaintiffs' medical expert

that the treatment and evaluation of Matthew fell far enough below the standards of the medical

profession to be considered grossly negligent.  Defendants address neither of these pieces of

evidence as concerns the gross negligence claim.  Viewing the evidence in the light most

favorable to the non-moving party, it is not possible to rule out the possibility that a reasonable

jury could find for Plaintiffs on their gross negligence claim against Dr. Alexander under these

facts.

Regarding the two other individual Defendants, Defendant Thomasseau is similarly

situated to Dr. Alexander, except he does not have the benefit of an MQAC decision exonerating

him for any "unprofessional conduct."  On the contrary – he was sanctioned by Washington

DOH for "unprofessional conduct in violation of RCW 18.130.180(4)" (Dkt. No. 23-12 at 3). Again, the totality of this evidence points to the impossibility of ruling out a judgment against Thomasseau on the basis of this proof.

For the same reasons cited *supra* regarding the failure of proof of Plaintiffs' § 1983 claim against Defendant Schaumberg, however, she is entitled to summary judgment of dismissal concerning the cause of action for gross negligence. Plaintiffs have presented no evidence that anything Schaumberg did amounted to an act of gross negligence or was the proximate cause of any of the tragic events which followed Matthew's discharge.

Defendants' motion is DENIED as regards this cause of action except as regards Defendant Schaumberg. Summary judgment on the gross negligence claim will be GRANTED regarding her and she will be dismissed from this cause of action and from this lawsuit.

Fifth Cause of Action: Corporate Negligence (Defendant VMC)

The gravamen of this claim is that VMC (the Board Defendants are not named in this cause of action) "breached [its duty of care] by failing to hire competent and properly trained employees, oversee care, and implement safety policies designed to prevent harm to patients." Complaint at ¶ 102.

Defendants claim to be seeking summary dismissal of all claims asserted against them, but the Court finds no analysis of this cause of action in their motion. The motion does not discuss the liability of VMC as an institutional Defendant (which it unquestionably is – it is named in the first page of the complaint; id. at ¶ 1), nor is "corporate negligence" mentioned in the briefing.

Furthermore, the statutory immunity afforded by RCW 4.24.470 has its limits: "[L]iability shall remain on the public agency for the tortious conduct of its officials or members of the governing body." RCW 4.24.470(1). The Court is unable, on this record, to grant summary judgment of dismissal of this final cause of action against VMC. The motion will be DENIED in this regard.

## Conclusion

Based on the Court's ruling, the following claims may still be brought against the following Defendants:

- First Cause of Action: 42 U.S.C. § 1983: summary judgment DENIED as to Defendants Alexander and Thommasseau, GRANTED as to Defendants Schaumberg, VMC, and the Board Defendants;

- Second Cause of Action: 42 U.S.C. § 12132, et seq. (ADA): summary judgment GRANTED as to all Defendants;

- Third Cause of Action: Medical Negligence (as to individual Defendants): summary judgment GRANTED;

- Fourth Cause of Action: Gross Negligence: summary judgment DENIED as to Defendants Alexander and Thommasseau, GRANTED as to Defendants Schaumberg, VMC, and the Board Defendants;

- Fifth Cause of Action: Corporate Negligence (Defendant VMC): summary judgment DENIED as to Defendant VMC.

The clerk is ordered to provide copies of this order to all counsel.

Dated May 8, 2019.

Marsha J. Pechman
United States Senior District Judge